RUBY DRILLING CO., INC., a Wyoming corporation, Appellant (Plaintiff),

v.

The TITLE GUARANTY COMPANY OF WYOMING, INC., a Wyoming corporation, Appellee (Defendant),

Campbell County Abstract Company, (Defendant).

The TITLE GUARANTY COMPANY OF WYOMING, INC., a Wyoming corporation, Appellant (Defendant),

v.

RUBY DRILLING CO., INC., a Wyoming corporation, Appellee (Plaintiff),

Campbell County Abstract Company, (Defendant).

Nos. 87-71, 87-72.

Supreme Court of Wyoming.

Feb. 18, 1988.

Peggy Taylor Pfau of Daly, Maycock, Anderson and Taylor, P.C., Gillette, for Ruby Drilling Co.

Barry G. Williams of Williams, Porter, Day & Neville, P.C., Casper, for Title Guar. Co. of Wyoming, Inc.

Before THOMAS, CARDINE, URBIGKIT and MACY, JJ., and GRANT, District Judge.

URBIGKIT, Justice.

Reciprocal appeals were filed in title insurance litigation resulting from a real estate installment sale—unpaid well-drilling charge/purchase default controversy. With stated issues of denied insurance company defense, questioned damages and judgment lien encumbrance on equitable title purchase interest resulting in a trial decision adverse to plaintiff, we note the nature of this action as complicated, and this court's adjudicative result of affirmance on both appeals.

Appellant Ruby Drilling Co., Inc. (Ruby), as the written assignee of an alleged claim against a local title agency and parent underwriter, Title Guaranty Company of Wyoming, Inc. (Title Guaranty), details its appeal issues as:

"1. DID THE TRIAL COURT ERR IN CONSTRUING THE CONTRACT TO FIND APPELLEE–DEFENDANT WAS NOT PROVIDED SUFFICIENT NOTICE TO DEFEND BECAUSE OF A SETTLEMENT WHICH CAME AFTER THE NOTICE AND FURTHER ERR BY FINDING THAT BREACH OF DUTY TO DEFEND COULD NOT BE HEARD?

"2. DID THE TRIAL COURT ERR IN FINDING APPELLANT–PLAINTIFF'S ASSIGNOR HAD SUFFERED NO DAMAGES BECAUSE OF A SETTLEMENT NOT MADE OR ENTERED INTO FOR THE BENEFIT OF THE INSURANCE COMPANY?"

Title Guaranty trends the issues to an evidentiary context:

"1. Was there substantial evidence to support the Trial Court's finding that the Appellee Title Guaranty was not given timely notice to allow it to enter a defense or otherwise participate in the resolution of the dispute between the Rodnes and Appellant in Civil Action No. 13904 in the District Court, Sixth Judicial District, Campbell County, Wyoming?

"2. Did the Trial Court err in finding that the Rodnes suffered no damage?"

Title Guaranty, successful in the trial court and now cross-appellant, asks this court as similarly but positively stated by Ruby as appellee:

"I. DID THE TRIAL COURT ERR IN NOT GRANTING THE APPELLANT–DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN THE FOLLOWING PARTICULARS:

"a. Failure to find that coverage under the title insurance policy terminated pursuant to Paragraph 2 of the Conditions and Stipulations of the policy;

"b. Failure to find that coverage under the title insurance policy terminated pursuant to Paragraph 7 of the Conditions and Stipulations of the policy.

"II. DID THE TRIAL COURT ERR IN ITS RULINGS THAT A JUDGMENT LIEN EXISTED ON THE PROPERTY WHEN MR. AND MRS. RODNE ENTERED INTO A CONTRACT FOR DEED FOR THE PURCHASE OF THE PROPERTY?"

In favoring Title Guaranty in the Ruby appeal, we will not consider the diligently argued but academic concerns of the now moot cross-appeal.

## FACTS

In order to understand this "well" litigation, the pleaded issues first need understanding. Appellant Ruby as property purchase-interest assignee, sued the local title agency as well as the parent underwriter, Title Guaranty, for $30,000 as the title insurance policy face amount for damages from a claimed insured title defect derived from a judgment lien obtained by Ruby against a defaulting prior purchaser. In

his conclusions of law, the trial court stated:

"(1) Pursuant to the terms of the insurance policy issued by defendant [Title Guaranty], sufficient notice was not provided in order to allow them to enter into the defense of the lawsuit.

"(2) By the terms of the settlement agreement, the Rodnes [second purchasers or property purchase-interest assignor] were made whole by repayment of the purchase price for the down payment and the installments on the purchase price that they made."

In 1982, Ruby drilled a water well for Kevin and Cheryl Hance on property being purchased by an installment contract from the subdivision developer, Landex Corporation. The Hances did not construct a residence on the property and did not pay for the well, nor did they maintain payments on the installment contract.[1] Effectuating the forfeiture attributes of the installment contract, Landex "repossessed" the vacant tract, as improved by the well, and arranged a $30,000 resale to Leif and Genice Rodne, which sale closed on April 6, 1984. Some two months earlier, Ruby had obtained a district court default judgment against the Hances, then residing in Montana, on an open-account claim for the well drilling bill of $15,106. Immediately after the Rodnes closed, they moved a newly purchased house trailer onto the property, and then, returning to the tract within a few days, discovered that the well equipment had been removed and the well filled with dirt. Ruby, although it had obtained the judgment, now at a later time and without permission had gone onto the property, removed the equipment and "deactivated" the well which it had previously drilled.

Not surprisingly, on discovering the destroyed well, which ended plans to move onto the property into the trailer from a rental then expiring, Rodnes not only screamed, but sued, including as defendants both Ruby and Landex. The litigation, with cross-claims, rapidly moved forward for a trial scheduled in mid-summer. Some time between filing of the suit and trial date, Title Guaranty received "notice" of a claim, which in itself has a curious dimension since neither Title Guaranty nor its insured were named as a party defendant (cross-claimant, counterclaimant, or third-party defendant) in the litigation. With regard to Ruby, Rodnes had alleged:

"10. That on or about April 10, 1984 the defendant Dale Ruby and the defendant Ruby Drilling, Inc. through its employees trespassed on the property without the permission of the plaintiffs and rendered the water well unusable by removing various portions of the well, including the pump and wiring, and by backfilling the remaining water well casing with dirt.

\* \* \* \* \* \*

"13. That the plaintiff Dale Ruby and the defendant Ruby Drilling, Inc. have willfully, wantonly and purposely stolen portions of plaintiffs' water well rendering it unfit for use thus causing damage to the value of the plaintiffs' real property and depriving plaintiffs of the use of their property."

As to Landex:

"17. Defendant Dale Ruby and defendant Ruby Drilling, Inc. claim that the defendant Landex, as the record owner of the property, acquiesced to the drilling of the well by the defendant Ruby Drilling, Inc. and that portions of the well were removed pursuant to defendant Landex's refusal to pay for the cost of the water well improvement to the property.

---

1. Used was a typical Wyoming real estate installment contract with escrowed deed for conveyance to buyer to be delivered upon payment in full, and a quitclaim deed to seller deliverable to evidence transaction termination upon default. This type of transaction, colloquially but imprecisely referred to as contract for deed, is an installment contract with equitable title transfer and seller-retained legal title until completion of payments to be followed with conveyance. In accord with the more carefully arranged installment contracts, a notice document was filed to evidence the existence of the executory sales transaction. Upon default, the quitclaim deed is released from escrow and recorded to authenticate a forfeiture by a recordable instrument to clear record title.

"18. That should the position of defendant Dale Ruby and defendant Ruby Drilling, Inc. be upheld, then the plaintiffs will not have received what they bargained for in purchasing the property. The defendant Landex's classified ad specified that the property was improved with a 'well' and the Warranty Deed executed on April 6, 1984 includes 'all improvements situate thereon'. The water well was an improvement on the property as of the date of closing."

The complaint did not allege an insured title defect; but perforce, the answer of Ruby, in justification of its malicious damage, alleged a judgment lien on the real property by virtue of the default judgment obtained against Hances. How that was to serve as a defense to the criminal and tortious trespass or property-destruction act is not clarified in pleading. Ruby also crossclaimed against Landex, alleging unjust enrichment arising from the Rodne sale at a price higher than the original sale to Hance by virtue of the well (as now destroyed) for which Ruby had not been paid. The gravamen of the next lawsuit as now here on appeal arises from this contention of Ruby that its crossclaim and defense created a duty of Title Guaranty to defend Rodnes, created by title insurance issued for Rodne as insured purchaser.

Before the immediately scheduled trial, and before Title Guaranty had made any final arrangements for disclaimer or defense, the Rodne/Ruby/Landex lawsuit was settled by an assignment by Rodne of the installment contract to Ruby, the Landex reduction in sale price by approximately $11,000 to a total amount of $18,739.01, which was the balance that would have remained in the event the Hance contract had remained in full force and effect. Ruby paid $4,000 to Rodne, and:

"3. Rodnes agree to, and do hereby, assign and convey unto Ruby all of their right, title and interest in said contract for deed and shall be relieved of all further obligations and liabilities with regard to said agreement.

"4. Said agreement for deed shall hereafter be between Landex as seller and Ruby as buyer and said agreement for deed shall be, and it hereby is, amended and modified to provide that the total purchase price shall be $18,739.01 and said purchase price shall bear interest at the rate of 13% per annum and shall be payable in equal monthly installments, including principal and interest, of $280.00 each, beginning on the 25th day of July, 1984, and on the 25th day of each month thereafter until April 1, 1994, at which time the entire remaining unpaid balance of the purchase price, together with all interest due thereon, shall be due and payable in full.

"5. Ruby and Landex agree that they shall place in escrow appropriate warranty deeds and quitclaim deeds along with escrow instructions pursuant to the provisions of said Agreement for Sale of Real Property assigned hereunder and that all of the terms and provisions of said agreement for sale shall be binding upon the parties hereto, provided that Landex shall be under no obligations to provide title insurance to Ruby for said Lot 26 and further provided that Ruby shall have the right to assign said contract for sale to third persons, provided that Ruby shall continue to remain liable for the performance of all obligations under said agreement, including the payment of all payments when due.

"6. Rodnes shall, and do hereby, assign unto Ruby all right, title and interest in and to that certain title insurance policy issued by the Title Guaranty Company of Wyoming, Inc. on Lot 26 of the Red Rock Estates, Campbell County, Wyoming, policy # 17–7370–0. In the event that Ruby shall receive any funds from said Title Guaranty Company pursuant to a claim upon said policy, either as a result of litigation or settlement, Rodnes shall have the right to receive the first $1,000 of any amount collected.

"7. Rodnes agree to dismiss their complaint against Ruby and Landex with prejudice and Landex and Ruby agree to dismiss their cross-claims against each other with prejudice. All of the parties hereto further release each other from all claims, demands or liabilities arising,

either directly or indirectly, out of or on account of the subject matter of this litigation, including without limitation, the warranty to the title to real property to Lot 26 of the Red Rocks Estates and the title insurance policy issued thereon as described above. It is the intent of this Settlement Agreement and Release that all of the parties hereto will be made whole as the result of this settlement and that neither party shall have a claim nor a right against any of the other parties, either directly or indirectly, hereafter. This Agreement and Release shall be for the benefit of and shall be binding upon the parties hereto and their heirs, successors and assigns.

"8. Ruby agrees that he shall refrain from execution upon the judgment against Hance in Civil Action # 13199, Campbell County, Wyoming, against Lot 26 of the Red Rocks Estates."

This lawsuit seasonably followed by Ruby against Title Guaranty and the local agency, with pleading for a damage recovery in the amount of the $30,000 title policy. Answers, in addition to a general denial, asserted five affirmative defenses.[2] Ruby made an extensive argument before the trial court, and again here, that the title company violated a "duty to defend." Rodne, from the answer filed by Ruby and consequent assignment from Rodnes, transferred that right in assigned collectable damage. Additionally, appellant asserts that the amount of the default judgment against Hance constituted a valid lien against the legal title ownership of Landex, and that by virtue of the title policy issued to Rodne, Ruby, as the assignee, was enti-

tled to recover even though the settlement agreement released rights against the purchase interest which they had acquired. Finally, a contentive thread is discernible, even though the validity of any contended lien was never determined and a settlement resulted which essentially transferred the property to Ruby at a value which removed any attribution of the value of the well or the cost of drilling the well, that the unpaid well drilling bill should constitute a determinable element of damages, despite the prior litigation settlement.

In declining to either expand or define the intrinsic title principles and insurance questions which can be extrapolated, or even to reflect on the question of whether a tortfeasor can recover from an insurance company for the effect of its own tortious conduct by assignment from the injured party, we simply affirm the determination that no damages were shown, even if the title insurance policy might be assignable (not determined), or there was a title defect (not concluded), or even if a duty to defend someone was created and then violated in undefined dollar damage. Had Ruby executed on its default judgment pursuant to § 1–17–414, W.S.1977 providing for sale of a judgment debtor's equitable or other interest in realty, all they could have reached was the defaulted status of the buyer, which obviously had little discernable value. The settlement agreement provided them exactly what they could have gotten, which was the opportunity to pay off the property at the same remaining value as it could have been acquired by an equitable execution process.[3] If in fact there was a title problem, that problem was resolved

---

**2.** It takes some hard looking and thinking to understand how Ruby expected to recover from an assignment of a claim arising from its own tortious conduct. The concept of merger is also presented if the claim sounded in title defect after contract assignment to Ruby who, if there was a title defect, was the "owner" of that claim and could not consequently owe or execute against itself, and particularly so after the release of rights of execution on the property in settlement agreement. *Bolln v. La Prele Live Stock Co.*, 27 Wyo. 335, 196 P. 748 (1921).

**3.** Although unannounced in complaint, there was another thread of contention in trial-court

memoranda, appellate brief, and oral argument that the assignment of "all right, title and interest they have in any claims against Campbell County Abstract, The Title Guaranty Company of Wyoming, Inc., and any and all parties responsible for failure of title under that certain policy" invoked more claim than title insufficiency as obtained by assignee, such as unsettled legal fees and miscellaneous damage, since a failure to defend caused Rodne to settle. In this regard, the cash settlement to Rodnes was not proved to be less than their title insurance damages, even if, as here undecided, such an unliquidated claim was assignable.

when Ruby got the property at exactly the same terms as it could have acquired the property in the event that it had proceeded through execution sale. Equity for execution was only available, provided as an unproven fact on this record that the executory installment contract was still in effect in any fashion when judgment was obtained. We concur with the trial court that no recoverable damages were proved by appellant, and consequently affirm.[4] *Willmschen v. Meeker,* Wyo., 750 P.2d 669 (1988). To the extent that a sufficiency-of-the-evidence context is presented, there is proper and adequate evidence under our normal appellate rules to affirm. *Hance v. Straatsma,* Wyo., 721 P.2d 575 (1986).

Affirmed.

4. We will leave for inquiry in a future case the interesting concept that a tortfeasor can settle with the claimant and take an assignment for the purpose of recovery of intangible losses sustained by virtue of the tortfeasor's conduct. Likewise, one piece of indispensable evidence is missing from this record for even this court, by first-time review, to determine whether any equitable interest of the first buyer existed at the date of entry of the default judgment so that a lien could result. The file does not show when notice of termination and forfeiture was given by Landex to Hance. Consequently, the recording of the quitclaim deed is of little significance if appropriate written notice under the terms of the installment contract, which in itself is not of record, had been earlier given. Neither a representative of Landex nor the Hances testified in this trial, and it is not possible to determine what did occur. The obvious losers in the transaction were Rodnes, by inconvenience and disturbance, as well as from loss in resale of the purchased house trailer for which they were paid $4,000, in part, and Landex, which lost the difference between the Rodne sale price and the reduced amount to be paid by Ruby. Ruby got the property for its apparent value after they had destroyed the well.